Order filed January 16, 2026.    2026 IL App (5th) 250022
Motion to publish granted
February 17, 2026.                NO. 5-25-0022

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| CITIZENS UNITED FOR RESPONSIBLE ENERGY DEVELOPMENT NFP, | ) ) ) | Appeal from the Illinois Commerce Commission |
| Petitioner, | ) ) | |
| v. | ) ) | ICC Docket No. 23-0299 |
| ILLINOIS COMMERCE COMMISSION; AMEREN TRANMISSION COMPANY OF ILINOIS; AMEREN ILLINOIS COMPANY, d/b/a Ameren Illinois; TRI-TOWNSHIP WATER DISTRICT; and ILLINOIS AGRICULTURAL ASSOCIATION, a/k/a Illinois Farm Bureau, | ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

_____

        JUSTICE VAUGHAN delivered the judgment of the court, with opinion.
        Presiding Justice Cates and Justice Sholar concurred in the judgment and opinion.

**OPINION**

¶ 1    Petitioner, Citizens United for Responsible Energy Development NFP (CURED), seeks review of the Illinois Commerce Commission's (Commission) November 7, 2024, order granting Ameren Transmission Company of Illinois's (ATXI) verified petition requesting a certificate of public convenience and necessity, along with the Commission's December 19, 2024, denial of CURED's application for rehearing. CURED also appeals the October 31, 2024, rulings that denied its motion to supplement the record and motion to dismiss ATXI's petition. For the following reasons, we affirm.

1

¶ 2                                    I. BACKGROUND

¶ 3     On April 5, 2023, ATXI filed a verified petition requesting a certificate of public convenience and necessity pursuant to section 8-406 of the Public Utilities Act (220 ILCS 5/8-406 (West 2022)). ATXI requested a certificate that authorized it to construct, operate, and maintain a new 138 kV electric transmission line (the Sursee-Aviston transmission line) and related facilities, including certain new or expanded substations, in Illinois. The petition further indicated that ATXI entered into an asset purchase and construction coordination agreement to purchase approximately 11.2 miles of existing 138 kV line from the City of Highland (the Jarvis-Sursee transmission line). ATXI alleged that a certificate of public convenience and necessity related to the Jarvis-Sursee transmission line was previously issued in Docket No. 93-0385. ATXI requested an order allowing it to expand, for compliance purposes, already existing easements associated with the Jarvis-Sursee transmission line and an order confirming the previously issued certificate was now held by ATXI. The petition addressed the necessity for the Sursee-Aviston transmission line project, the project route, and land rights related to the new line. The petition also addressed ATXI's capability to efficiently manage and supervise the construction process and its ability to finance the project without significant adverse financial consequences to the utility or its customers. The Sursee-Aviston transmission line project was scheduled to be in service by December 2025.

¶ 4     CURED, Tri-Township Water District (TTWD), and Illinois Agricultural Association petitioned to intervene in the proceeding and the petitions were granted. In June 2023, two memorializations of *ex parte* communications were filed by Commission Staff. The first memorial was related to web conferences on May 30, 2023, and June 2, 2023, between Commission Staff counsel (Meagan Morley and Joan Simpson), counsel for ATXI (Carrera Thibodeaux and Albert Sturtevant), and counsel for Ameren Services Company (Cole Bailey and Jason Kumar) to discuss

2

procedural concerns related to ATXI's petition. The second memorialization involved an email, and web conferences occurring on June 9, 2023, and June 14, 2023. Those communications involved Commission Staff counsel (Meagan Morley and Andrea Jakubas), deputy general counsel (Matthew Harvey), counsel for ATXI (Carrera Thibodeaux, Albert Sturtevant, and Anne Zehr), and counsel for Ameren Services Company (Cole Bailey and Jason Kumar). The topic again involved procedural concerns related to ATXI's petition.

¶ 5    A pretrial conference hearing was held before the administrative law judges (ALJs) on June 21, 2023. When asked about the submission of testimony schedule,[1] counsel for ATXI, Albert Sturtevant, advised of "a couple of procedural proposals" that might have some bearing on the testimony schedule. Sturtevant indicated that prior discussions between ATXI and Commission Staff resulted in ATXI concluding it would seek Commission authority with respect to the existing Jarvis-Sursee transmission line in a separate proceeding. Counsel then orally moved for leave to amend the petition as it related to the existing Jarvis-Sursee transmission line which would remove paragraphs 36 through 39 of ATXI's petition. CURED's counsel asked if that was due to a procedural problem with notice to the landowners on that route and requested additional time to determine whether ATXI's request was in the best interest of his clients because it was "the first time I've ever had a chance to think about it." CURED's counsel stated that he needed to know which, if any, of his clients would be affected by the proposal. TTWD agreed and also requested a written motion from ATXI so the parties could address the issue.

¶ 6    Commission Staff counsel, Ms. Morley, provided context behind ATXI's request, stating:

---

[1]Evidence in this case was submitted pursuant to a schedule. ATXI filed its direct testimony in transcript form when it filed the petition. Commission Staff and Intervenors filed their direct testimony in support or in opposition to ATXI's petition on September 22, 2023. Thereafter, ATXI filed its rebuttal testimony on November 9, 2023. Commission Staff and Intervenors filed their rebuttal testimony on December 8, 2023. Surrebuttal testimony by ATXI was filed on December 22, 2023.

3

"So in the Company's original application, it is seeking a finding from the Commission that its certificate granted to IMEA [Illinois Municipal Electric Agency] now belongs to ATXI.

And I think that is what Staff had a concern about. I think that there's some concern about the Commission determining that a certificate from, you know, 1998, or whenever that certificate was granted to IMEA, how that would transfer to ATXI in this proceeding?

So from our perspective, the second proceeding is a much cleaner way to ensure that the Company is getting an A406 certificate for the Highland line, the Jarvis-Sursee line, and that the Commission has a clear way of analyzing each line separately because, you know, each line has different landowners involved and we need to make sure that the right landowners are receiving notice.

And so I think that was the idea behind the two separate proceedings was to make sure that the Commission can clearly analyze that the Company can be certified for both of these separate lines instead of kind of combining these into one analysis."

¶ 7 A briefing schedule was established for ATXI's written motion to amend its petition and responses related thereto. CURED's counsel then asked, "Am I led to believe that with regard to the *ex parte* discussions they related to this issue with regard to separating out this particular case and having it proceed on a separate docket and that was the gist of the discussions back and forth?" ATXI's counsel replied, "I think it's fair to say that, you know, the scope of the proceeding was one of the things that was discussed." CURED's counsel then asked, "Was there anything else Intervenors should know about? That's the gist of my question." The administrative law judge

4

(ALJ) noted the filed memorializations and CURED's counsel confirmed he was aware of them but stated, "They're not all that informative to me, but it's simple. I mean, if it's what they were talking about, now we know and let's proceed accordingly."

¶ 8     On June 23, 2023, Commission Staff filed an additional memorialization of *ex parte* communications that occurred on June 20, 2023, between Meagan Morley and Albert Sturtevant. The substance of the communication again stated there was a "[d]iscussion regarding procedural concerns related to [ATXI's] petition." The requested or recommended action stated, "Procedure and scheduling request."

¶ 9     On June 26, 2023, ATXI moved to amend its petition by withdrawing its allegations in paragraphs 36 through 39 as well as the requests for relief related thereto. The motion explained that Commission Staff requested ATXI obtain its own section 8-406 certificate for the Jarvis-Sursee transmission line because the original certificate granted to IMEA was 25 years old and the City of Highland, which was a nonregulated municipality, later acquired the certificate from IMEA. ATXI's motion contended that in light of Staff's request, it agreed to seek its own certificate as to the Jarvis-Sursee line. It further contended that consideration of the Sursee-Aviston and Jarvis-Sursee lines in separate proceedings would be more efficient because it would allow the Sursee-Aviston line to move forward while ATXI prepared the separate application for the Jarvis-Sursee transmission line.

¶ 10     CURED objected to the motion arguing that the motion was essentially a voluntary dismissal and undermined the doctrines of *res judicata* and collateral estoppel. It argued that allowing the motion would require CURED to intervene in the new and separate proceeding to "avoid being bound in this proceeding by an adverse decision rendered by the Commission on the issue in that proceeding." Commission Staff filed a response in support of ATXI's motion.

¶ 11     On August 16, 2023, the ALJ issued a docket entry order granting ATXI's motion to amend it petition. The docket entry stated the amendment would "promote clarity and administrative efficiency" and would also "ensure that all landowner notice requirements [were] met." It further stated:

> "As noted by Staff, the appropriate procedural path forward is for ATXI to seek the Section 8-406 certification and Section 8-503 order for the Jarvis-Sursee line in a separate proceeding. This would allow the instant proceeding related to the new Sursee-Aviston line to continue and would prevent the Company from having to introduce additional evidence and provide additional notice in this proceeding related to the Jarvis-Sursee line. While the Jarvis-Sursee line and Sursee-Aviston line are part of the same overall project, these are two separate and distinct lines impacting different landowners; the Commission should separately analyze and determine whether ATXI meets the requirements of Section 8-406 for each line. Moreover, for the reasons articulated by ATXI, CURED NFP's argument regarding *res judicata* is rejected. It is well- and long-established that *res judicata* does not apply to Commission orders."

¶ 12     CURED sought interlocutory review of the ALJ's order granting ATXI's motion to amend as well as a motion for oral argument on the petition for leave to appeal. Commission Staff and ATXI filed responses requesting denial of both pleadings. On September 19, 2023, Commission Staff filed another memorialization of *ex parte* communications which was based on clarification of ATXI's response to a discovery request addressing "load forecasting within and outside the study area for the project." The communication occurred by telephone on September 18, 2023, and included Jenna Maurer (electrical engineer), Eric Lounsberry (Director of Safety & Reliability

6

Division), Bryan Pemble (Assistance Director of Safety and Reliability Division), and Eugene Warnecke (Supervising Engineer, Transmission Planning–Ameren).

¶ 13 On September 20, 2023, CURED filed a motion to take administrative notice of facts based on the Commission's May 6, 1998, remand order in Docket No. 93-0385, related to IMEA's petition for approval of the construction of a 138 kV electric transmission line in Highland. The order was previously attached to ATXI's initial verified petition and provided a history of prior ownership and certification as it related to ATXI's Jarvis-Sursee transmission lines. CURED requested the Commission take judicial notice of that history.

¶ 14 On September 19, 2023, a memorandum was sent to the Commission by ALJs Nicole Roth and Daniel Coultas, recommending denial of CURED's petition for interlocutory review and request for oral argument. On September 21, 2023, the Commission denied CURED's petition for interlocutory review and denied CURED's request for oral argument.

¶ 15 On October 4, 2023, ATXI and Commission Staff filed briefs in opposition to CURED's motion to take administrative notice of facts with both arguing that the information was no longer relevant in the current proceeding due to the removal of all requests for relief related to the Jarvis-Sursee transmission in the current petition. On January 3, 2024, the ALJs denied CURED's motion to take administrative notice of facts.

¶ 16 Thereafter, CURED filed several more motions including: (1) a motion for leave to serve discovery requests on Ameren Illinois that required a response within seven days; (2) a motion to allow ATXI's admissions in discovery responses and certain rebuttal testimony introduced as part of CURED's case in chief evidence; (3) a motion to require certain directors, officers, employees, and agents of adverse parties personally attend the hearing as opposed to virtual appearances; and (4) a motion to take administrative notice of certain documents submitted as exhibits and of related

7

facts. On March 29, 2024, the ALJs found the first and third requests were moot and therefore denied the requests. CURED then filed a petition for interlocutory review as to the denials. On April 10, 2024, the ALJs denied the two remaining motions as well.

¶ 17 A hearing on the merits of ATXI's petition occurred on April 16, April 17, and April 18, 2024.[2] James Jontry identified his previously submitted direct testimony, and the transcript was submitted into the evidence. The testimony from James Jontry revealed that he was a professional engineer, a senior project manager for Ameren Services, and that he provided professional services to ATXI in this matter. He explained that he was responsible for the planning, execution, completion, and operational integration of large-scale transmission construction projects. In addition to his testimony regarding the scope, schedule, design, construction, commissioning, and testing of substation and transmission line projects, Jontry provided testimony in support of ATXI's capability of financing the proposed construction without significant adverse financial consequences for ATXI or its customers.

¶ 18 Jontry's written testimony explained that ATXI would manage costs associated with constructing the project by implementing a milestone payment process known as the weighted method for construction of the project. He explained that the weighted method was a project management technique for forecasting cash flow while measuring project performance and progress using predetermined milestone achievement dates in a manner that measured scope, schedule, and cost into a single integrated system.

¶ 19 Jontry's written testimony estimated the total cost associated with the project was $62.3 million, which included the costs related to the construction of Sursee-Aviston transmission line,

---

[2]The record contains voluminous testimony, both written and oral, most of which is not relevant to the issues raised in this appeal. Accordingly, we include only the testimony necessary to address the issues on appeal.

construction of the new Sursee substation, acquisition of the existing 138 kV line from Highland, and integration of those facilities at the system terminals in Aviston, Jarvis, and Sursee. It also included all anticipated real estate acquisition costs and other project development expenses. He stated that the cost solely for the Sursee-Aviston transmission line, including all of the associated right-of-way (ROW) acquisition costs, but excluding the work to be performed at the Sursee and Aviston substations was approximately $34 million.

¶ 20    Jontry also provided written testimony explaining that ATXI would finance the initial capital cash flow requirements with either available cash on hand or short-term borrowings, which would be available under Ameren's Utility Money Pool arrangement up to a $300 million limit. The related amount of ATXI borrowings outstanding was $15 million, leaving ATXI a remaining borrowing capacity of $285 million. He stated that ATXI would eventually replace the short-terms borrowings with a permanent source of capital that included a balanced blend of long-term debt and common equity. He stated the method of financing was consistent with how ATXI typically financed its capital needs. He explained that ATXI's capital structure was composed of short-term debt, long-term debt, and common equity. He stated that ATXI continuously managed the balance of debt and equity in its capital structure to minimize its overall cost of capital and maintain financial strength and stability.

¶ 21    Jontry's written testimony explained that ATXI presently had access to sources of long-term debt and equity to finance construction of the project noting that ATXI had an "A2" issuer credit rating by Moody's Investor Services. He stated that this was considered "an investment grade" rating that implied a certain degree of financial strength and stability with reasonable assurance of an insurer's ability to satisfy its debt obligations. The rating provided reasonable assurance that ATXI would be able to access the capital markets on a timely basis, at a reasonable

9

cost, with reasonable terms and conditions. He opined that ATXI's financial strength allowed it to attract long-term capital at very favorable rates and terms. He further noted that being a regulated business also provided ATXI with on-going cash and equity in the form of retained earnings that would also provide a source of funding in the form of equity used to finance the project. He stated that periodic infusions of equity from Ameren Corporation could also be a source of equity that would appear as "paid-in capital" on ATXI's balance sheet.

¶ 22    Finally, Jontry opined in his written testimony that those potential sources of capital were sufficient to finance construction of the project and the projected construction costs would not impact ATXI's access to the capital needed to finance the project's construction. He stated that no individual customer or group would directly reimburse ATXI for the cost of the project. He explained that ATXI would recover the cost of the project because the project facilities would be included in the ATXI transmission revenue requirement calculated under the Midcontinent Independent System Operator (MISO) tariff and recovered through MISO Schedule 9 from all transmission customers in the Ameren Illinois (AIC) pricing zone.

¶ 23    Following the submission of Jontry's written testimony, CURED's attorney then cross-examined him[3] for over two and half hours. As to the issues raised on appeal, the only questions asked about costs related to the project that involved AIC negotiating to acquire approximately 10 acres of property adjoining the current Ameren substation in Aviston. Jontry believed the purchase was included in the costs in this case but was unsure of the exact amount previously allocated toward the purchase. Thereafter, CURED moved to admit Cross Exhibit Nos. 2, 31, 32, 33, 34, 35

---

[3]Although evidence is typically only provided through the evidentiary schedule, CURED requested that ATXI's witnesses appear in-person for cross-examination at the hearing. ATXI acquiesced in the request so live testimony also occurred at this hearing.

and 40.[4] ATXI did not object since the basis of the request was to shorten cross-examination of the witnesses, and the motion was granted. None of the cross exhibits addressed ATXI's financing of the project but did address CURED's alternative route for ATXI's transmission line. After the cross exhibits were admitted, CURED's attorney continued to cross-examine Jontry. However, that testimony was limited to "least-cost means"[5] related to ATXI's preferred route for the transmission line, ATXI's relationship with AIC and Ameren on the project, and the cost estimate related to the estimated schedule for work. Relevant here, Jontry confirmed the costs previously set forth in his written testimony related to the project and how the costs would be recouped. No questions were asked about ATXI's ability to finance the project.

¶ 24    At the hearing, Jenna Maurer identified her previously provided written testimony and it was admitted into the record. The written testimony revealed that Maurer was an electrical engineer in the Safety and Reliability Division of the Illinois Commerce Commission. In her position, Maurer reviewed planning and operating practices of Illinois-regulated electric utilities and provided information, technical expertise, and recommendations to the Commission through Staff reports or testimony. Her testimony was related to whether ATXI met the requirements for the issuance of a certificate and whether the Commission should grant ATXI's petition. She concluded that there was no reason to oppose ATXI's petition for a certificate for the Sursee-

---

[4]"Cross exhibit" was the designation assigned to CURED's exhibits used during Jontry's cross-examination. The exhibits contained the following: CE No. 2 listed CURED's definitions for the proceeding. CE Nos. 31-35 and 40 were ATXI's responses to CURED's request to admit addressing the ownership and operator names for the westward Highline Road 69kV transmission line path, along with distances between points requested by CURED. The Highline Road path was part of CURED's recommended route for the transmission line; however, ATXI rejected that option noting that a large, forested wetland complex accessible only by a private driveway was a deterrent to using that route as it raised "elevated landowner concerns, environmental impacts, and safety concerns."

[5]"Least-cost means" is part of the criteria analyzed by the Commission to determine if a certification for public necessity should be granted. See 220 ILCS 5/8-406.1(f) (West 2024).

Aviston transmission line and recommended the Commission issue an order authorizing construction of the proposed new 138 kV transmission line using the route provided by ATXI.

¶ 25    Maurer's written testimony explained the project and advised what ATXI was required to demonstrate for the project. In the written testimony, she was asked if ATXI was capable of financing the proposed construction without significant adverse financial consequences and replied that ATXI verified that it was capable of financing the project without significant adverse financial consequences. She also referenced Jontry's written testimony on ATXI's ability to finance the project. While acknowledging that she was neither an accountant nor a financial expert, Maurer testified that she had "no reason to question ATXI's assertion that it [was] capable of constructing the project without significant adverse financial consequences."

¶ 26    Maurer also provided written rebuttal testimony on December 8, 2023. At that time, she testified that she reviewed the data requests exchanged by the parties, the direct testimony of the CURED witnesses, and the rebuttal testimony of the ATXI witnesses. CURED's evidence was based on impacted farmland, damage to property, reduced property value and its alternative route, and therefore, Maurer also addressed those concerns raised by CURED's witnesses as well as the proposed alternative route that ran from Highland to McCord. Ultimately, Maurer testified that none of the additional information caused her to change her position, and she continued to recommend that the Commission grant ATXI's request for a certificate.

¶ 27    CURED's counsel also cross-examined Maurer at the hearing. During cross-examination, Maurer agreed that she had an opinion as to whether ATXI had adequate financing. She stated that the opinion was based on her "general knowledge about the company itself and then the project." She had no reason to believe the company could not support the project. She agreed that neither her training to be an electrical engineer, nor her previous job experience, included finance. When

12

asked if she had any expertise in regard to financing, Maurer stated she was "not a finance person. I'm an engineer." She agreed there was a separate section at the Commission that dealt with finance and averred that her written testimony did not include anything that was prepared by the finance portion of the Commission. She further stated that she did not rely upon or confer with anyone in the Commission finance section in providing her opinion.

¶ 28 Following submission and admission of the evidence, and cross-examination of the witnesses, the hearing ended. On May 8, 2024, notice was issued by the ALJ stating the matter was "Heard and Taken" on April 18, 2024.

¶ 29 The parties submitted briefs following completion of the hearing. CURED argued, *inter alia*, that Staff failed to examine and analyze the question of ATXI's capability to finance the project. In response, Staff argued that Maurer made a determination based on her knowledge and review of ATXI's testimony and discovery responses which was sufficient in other transmission project cases heard by the Commission. Staff further argued that a financial analyst from the Commission Staff's financial analysis division submitted two data requests regarding ATXI's financing capability and received ATXI's responses. It noted that CURED was copied on ATXI's responses which were served on August 25, 2023. Staff argued it did not submit those responses at the hearing because it had no issue with ATXI's financial capabilities; however, CURED could have raised the issue in testimony, but did not.

¶ 30 On September 10, 2024, the ALJs issued a 95-page proposed order granting ATXI the requested certificate and addressing CURED's additional issues related to real estate matters, landowner complaints, and alleged due process violations. The decision also included language related to Staff's alleged failure to examine or analyze ATXI's financial capability and rejected CURED's arguments in their entirety referencing the Commission Staff arguments about ATXI's

13

responses to Staff data requests, why those responses were not put into evidence at the hearing, as well as CURED's failure to raise the issue in its testimony. The proposed decision concluded that CURED's argument "that Staff failed to analyze the Company's financial ability is a red herring and should be ignored." It continued by stating there was no indication that CURED had "valid concerns regarding the Company's financial ability to fund the proposed construction since the issue was not raised" in CURED's testimony and failed to cite to any discovery it conducted in this matter. The decision found CURED's claim was "patently false," and Maurer's testimony was sufficient especially since ATXI did not have retail customers that could be harmed by increased rates citing previous decisions that reached similar results in such situations. The parties were provided with the opportunity to submit proposed revisions to the order and all parties provided briefs.

¶ 31      In addition to submitting a brief with requested revisions, CURED also filed two motions. The first was a motion to "supplement record by requiring full disclosure thereon of all written communications made, all written responses received, all oral communications made, all oral communications received, and all matters discussed, by Staff counsel" with counsel for Ameren Services Company and with counsel of ATXI as it related to the *ex parte* discussions previously memorialized by Commission Staff. Therein, CURED contended that ATXI never could have succeeded in obtaining the certificate for the Jarvis-Sursee line because it failed to hold the necessary prefiling public meeting. It also claimed that Staff was aware of this defect and should have moved to dismiss ATXI's petition but "appeared" to be biased toward ATXI's position based on the vague memorializations filed regarding the *ex parte* communications.

¶ 32      CURED's second motion requested dismissal of ATXI's amended verified petition based on the *ex parte* communications claiming the discussions violated the contested case provisions of

14

the Illinois Administrative Procedure Act (APA) (5 ILCS 100/1-1 *et seq.* (West 2024)), rendering the proceeding void. The motion contained nearly the identical argument as set forth in the motion to supplement. ATXI filed responses to the motions arguing that CURED's motions were untimely, based on speculation and innuendo, and employed faulty reasoning. Commission Staff agreed with ATXI's argument and further argued that pursuant to statute, namely, section 10-103 of the Public Utilities Act (220 ILCS 5/10-103 (West 2024)), the APA did not apply and therefore, CURED's argument had no merit.

¶ 33 On October 31, 2024, the ALJs denied CURED's motion to supplement and its motion to dismiss. The ALJs found the motions were untimely, noting that the communications occurred in May and June 2023 and CURED filed the motions October 2024, after the record was closed and a proposed decision was issued by the ALJs. They further found the motions were not relevant to the issues raised in the proceeding because the Jarvis-Sursee transmission line was being addressed in a separate proceeding. The decision stated that CURED's assertions were not sufficiently supported by fact or law and dealt with a transmission line that was not at issue in the current case. The ALJs' decision further noted that ATXI's initial petition did not seek a new certificate for the Jarvis-Sursee transmission line in its original pleading and therefore prefiling public meetings were not required because ATXI only sought to expand the existing easements related to that line. The ALJs' decision also noted that CURED's issue was not raised before the ALJs at the hearing. As to the issue of *ex parte* communications, the ALJs' decision accepted Staff's reliance on section 10-103 of the Public Utilities Act (*id.*) that precluded reliance on the APA if the Commission employees were engaged in "advocacy functions" at the time the communications occurred. While CURED previously argued that the communications could not be advocacy functions because they

15

were not made in public, the ALJs' decision found that CURED's limitation of "advocacy" to include only statements made in public was "absurd."

¶ 34    On October 31, 2024, the ALJs also issued a memorandum to the Commission recommending entry of a 77-page order. On November 7, 2024, the Commission issued the ALJs' order without objection and granted ATXI's request for a certificate. As to the issue of ATXI's financial ability, the Commission noted, *inter alia*, Jontry's testimony setting the total cost of the Sursee-Aviston transmission line project at $63 million, with approximately $34 million of that amount solely for the Sursee-Aviston transmission line. It noted his testimony indicated ATXI would finance the initial capital cash flow requirements with either available cash on hand or short-term borrowings, under Ameren's Utility Money Pool that had a $300 million limit. The order also noted Jontry's testimony that revealed ATXI had only borrowed $15 million against the $300 million, leaving ATXI $285 million available from the Pool. It further noted that ATXI had access to sources of long-term debt and equity to finance construction of the project and currently had an "A2" credit rating by Moody's Investor Services.

¶ 35    On December 6, 2024, CURED requested a rehearing on the Commission's final order. On December 10, 2024, the ALJs issued a memorandum to the Commission recommending denial of CURED's application for rehearing. The Commission denied the rehearing on December 19, 2024, and CURED appeals.

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, CURED argues that its motion to dismiss should have been granted because the Staff's *ex parte* communications violated the contested case provisions of the APA rendering the proceeding void. It further argues that the Staff's failure to place copies of the *ex parte* communications stemming from the June 9, 2023, and June 14, 2023, communications in the

16

record violated the APA and rendered the proceeding void. Finally, CURED argues that the Commission decision finding that ATXI was "capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers" relied on matters outside the record in violation of section 10-103 of the Public Utilities Act (220 ILCS 5/10-103 (West 2024)), section 10-35(c) of the APA (5 ILCS 100/10-35(c) (West 2024)), and the due process clauses of the fourteenth amendment to the U.S. Constitution and article I, section 2 of the 1970 Illinois Constitution.

¶ 38    Our review of the Commission's order is limited to that statutorily proscribed. 220 ILCS 5/10-201(e) (West 2024). This court is required to reverse a Commission decision, in whole or in part, only if: (1) the Commission findings are not supported by substantial evidence; (2) the decision is outside the Commission's jurisdiction; (3) the decision violated state or federal constitution or law; or (4) the Commission proceeding was in violation of state or federal constitution or laws and prejudiced the appellant. *Id.* § 10-201(e)(iv). This court presumes the Commission's decision is "*prima facie* reasonable," and the burden of proof on all issues raised in the appeal is on the appellant. *Id.* § 10-201(d).

¶ 39    We start with the alleged *ex parte* violations as they concern both the motion to supplement and the motion to dismiss. "While the commission is not a court, the same rules as to the admissibility of evidence as in a court should be observed in its hearings." *Chicago & Northwestern Ry. Co. v. Illinois Commerce Comm'n*, 326 Ill. 625, 630 (1927). As such, "[t]he decision to admit evidence is within the court's discretion and will not be disturbed on appeal absent an abuse of that discretion." *Northern Moraine Wastewater Reclamation District v. Illinois Commerce Comm'n*, 392 Ill. App. 3d 542, 573 (2009). The same standard applies to a motion to supplement the record. *McGoey v. Brace*, 2022 IL App (1st) 210322, ¶ 39. "[A]n abuse of

17

discretion will be found only where no reasonable person would take the view adopted by the trial court." *Id.* Rulings on motions to dismiss are reviewed *de novo. Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 319-20 (2003).

¶ 40     There is no dispute that communications occurred between the attorneys representing the Commission Staff and the attorneys representing ATXI. The issue of whether the *ex parte* communications were sufficient violations of law to void the Commission decision is one of dispute between the parties and stems from language found in the APA as well as the Public Utilities Act. Issues concerning statutory interpretation involve questions of law that are reviewed *de novo. Board of Education of Chicago v. Moore*, 2021 IL 125785, ¶ 18.

¶ 41     "The cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature." *Cleeton v. SIU Healthcare, Inc.*, 2023 IL 128651, ¶ 28. This is best shown by the plain and ordinary language set forth in the statute. *Dawkins v. Fitness International, LLC*, 2022 IL 127561, ¶ 27. "[A]ll of the provisions of an enactment are to be viewed as a whole." *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 40 (2001). We should not consider words and phrases in isolation but instead consider them in conjunction with other relevant provisions within the statute. *Id.* Our review of the language seeks to avoid an interpretation that would lead to inconvenience, absurdity, or unjust results. *Id.* "When the statute contains undefined terms, we may rely on prior cases construing those terms." *Cleeton*, 2023 IL 128651, ¶ 28. If the language is clear and unambiguous, we need not resort to additional methods of statutory construction. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11.

¶ 42     Here, the parties dispute whether the *ex parte* communications are governed by the APA or the Public Utilities Act. Section 10-103 of the Public Utilities Act (220 ILCS 5/10-103 (West 2024)) states:

"The provisions of Section 10-60 of the Illinois Administrative Procedure Act [(5 ILCS 100/10-60 (West 2024))] shall apply in full to Commission proceedings, including ratemaking cases, any provision of the Illinois Administrative Procedure Act to the contrary notwithstanding."

¶ 43 Section 10-60 of the APA provides the following regarding *ex parte* communications:

"(a) Except in the disposition of matters that agencies are authorized by law to entertain or dispose of on an *ex parte* basis, agency heads, agency employees, and administrative law judges shall not, after notice of hearing in a contested case or licensing to which the procedures of a contested case apply under this Act, communicate, directly or indirectly, in connection with any issue of fact, with any person or party, or in connection with any other issue with any party or the representative of any party, except upon notice and opportunity for all parties to participate.

(b) However, an agency member may communicate with other members of the agency, and an agency member or administrative law judge may have the aid and advice of one or more personal assistants.

(c) An *ex parte* communication received by any agency head, agency employee, or administrative law judge shall be made a part of the record of the pending matter, including all written communications, all written responses to the communications, and a memorandum stating the substance of all oral communications and all responses made and the identity of each person from whom the *ex parte* communication was received.

(d) Communications regarding matters of procedure and practice, such as the format of pleadings, number of copies required, manner of service, and status of proceedings, are not considered *ex parte* communications under this Section." 5 ILCS 100/10-60 (West 2024).

¶ 44 CURED's claim of error is based on section 10-60(c) of the APA because Staff failed to provide a copy of "all written communications" or "written responses" in the memorialization of the *ex parte* communication. CURED therefore claims the Commission decision is void. However, CURED fails to consider the remaining portion of section 10-103 of the Public Utilities Act that provides:

"The provisions of Section 10-60 shall not apply, however, to communications between Commission employees who are engaged in investigatory, prosecutorial or advocacy functions and other parties to the proceeding, provided that such Commission employees are still prohibited from communicating on an *ex parte* basis, as designated in Section 10-60, directly or indirectly, with members of the Commission, any administrative law judge in the proceeding, or any Commission employee who is or may reasonably be expected to be involved in the decisional process of the proceeding. Any commissioner, administrative law judge, or other person who is or may reasonably be expected to be involved in the decisional process of a proceeding, who receives, or who makes or knowingly causes to be made, a communication prohibited by this Section or Section 10-60 of the Illinois Administrative Procedure Act as modified by this Section, shall place on the public record of the proceeding (1) any and all such written communications; (2) memoranda stating the substance of any and all such

20

oral communications; and (3) any and all written responses and memoranda stating the substance of any and all oral responses to the materials described in clauses (1) and (2)." 220 ILCS 5/10-103 (West 2024).

¶ 45 There is no claim that the Commission Staff attorneys had *ex parte* communications with any members of the Commission's decisional body.[6] The memorialization requirements in section 10-103 are applicable only to those Commission members who are part of the decisional process. As such, those memorialization requirements are inapplicable here. Therefore, the memorialization requirements of section 10-60 of the APA are applicable only if the Commission Staff were not "engaged in investigatory, prosecutorial, or advocacy functions" when communicating with ATXI's attorneys.

¶ 46 Staff previously argued that its attorneys were acting in a prosecutorial function. In response, CURED contended that prosecutorial function could only occur in public and therefore this was not a prosecutorial function. CURED provided no citation to support its claim that limits prosecutorial action to public action and we are aware of no such requirement.

¶ 47 Typically, an *ex parte* communication is "[a] communication between counsel or a party *and the court* when opposing counsel or party is not present." (Emphasis added.) Black's Law Dictionary (12th ed. 2024). It is an accepted reality that attorneys—even in adversarial proceedings—communicate about procedure, evidence, and even settlement when not before the decision-making tribunal. These communications occur daily via telephone, video conference, emails, and even letters. We have every reason to believe that similar communications between Commission Staff attorneys and a party's attorney also occur. Given the definition, these

_____

[6]The Commission Staff are not decision makers. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 202 (1989). The Commission Staff makes recommendations to the Commission and ALJs based on the evidence submitted; however, the ALJ and Commission are independent bodies who are not required to accept Staff recommendations. *Id.*

21

communications are not true representations of *ex parte* communications when the Commission Staff attorneys are not involved in the decision-making process.

¶ 48 Regardless, when communications between Commission Staff and a party's attorney are classified as *ex parte* (see, *e.g.*, 5 ILCS 430/1-1 *et seq.* (West 2024)), an exception to the *ex parte* rule under the Public Utilities Act involves communications "between Commission employees who are engaged in investigatory, prosecutorial or advocacy functions and other parties to the proceeding." 220 ILCS 5/10-103 (West 2024). It is well established that " '[a] hearing before the [Commerce Commission] is not a partisan hearing with the commission on one side arrayed against the utility on the other. It is an administrative investigation instituted for the purpose of ascertaining and making findings of fact.' " *Illinois Central R.R. Co. v. Illinois Commerce Comm'n*, 399 Ill. 67, 74 (1948) (quoting *Fleming v. Illinois Commerce Comm'n*, 388 Ill. 138, 147 (1944)); see also *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 202 (1989) ("The Act gives the Commission investigative powers. [Citation.] The Commission, usually through its Staff, may gather evidence, subpoena witnesses, depose witnesses, or require the production of documents in order to determine whether a utility has complied with the Act."). The Illinois Supreme Court previously noted the various roles of the Staff are "separate from the commissioners, hearing examiners and other members of the Commission who render decisions." *Business & Professional People for the Public Interest*, 136 Ill. 2d at 202. Those functions include investigatory, prosecutorial, or advocacy functions. *Id.* Given the underlying investigatory function of the Commission, we find that Staff's attorneys communicating with ATXI's attorneys regarding procedural issues related to ATXI's petition would fall within the confines of an investigatory function.

22

¶ 49    With these legal concepts in hand, statutory interpretation requires this court to find that the exception as to Commission employees engaged in investigatory, prosecutorial, or advocacy functions and other parties to the proceeding found in section 10-103 of the Public Utilities Act applies. As such, no documentation was required pursuant to section 10-60 of the APA. Further, as noted above, no documentation is required under section 10-103 of the Public Utilities Act because that requirement is only for *ex parte* communication between the Commission employees and the Commission members. That said, however, the relevance of the State Officials and Employees Ethics Act (SOEEA) (5 ILCS 430/1-1 *et seq.* (West 2024)), which is applicable to Illinois Commerce Commission employees (*id.* § 5-50(e)), must also be considered. The SOEEA defines an "*ex parte* communication" as

> "any written or oral communication by any person that imparts or requests material information or makes a material argument regarding potential action concerning regulatory, quasi-adjudicatory, investment, or licensing matters pending before or under consideration by the agency. '*Ex parte* communication' does not include the following: (i) statements by a person publicly made in a public forum; (ii) statements regarding matters of procedure and practice, such as format, the number of copies required, the manner of filing, and the status of a matter; and (iii) statements made by a State employee of the agency to the agency head or other employees of that agency." *Id.* § 5-50(b).

The SOEEA requires that an agency employee who received the *ex parte* communication to memorialize the communication and make it a part of the record. *Id.* § 5-50(b-5).

¶ 50    Here, the memorializations filed by the Staff attorneys were necessary, not because of any requirement under the APA or the Public Utilities Act. The memorializations were required under

23

SOEEA and were made under SOEEA, as reference to that Act is seen on the last page of each memorialization. SOEEA required nothing more than the document filed by Staff attorneys. Therefore, we cannot find that the Commission's denial of CURED's motion to supplement was an abuse of discretion. Nor can this court find that the contested case provisions of the APA were violated where Staff attorneys adhered to the relevant clause related to *ex parte* communications under section 10-103 of the Public Utilities Act and section 5-50(b-5) of the SOEEA. Accordingly, we disagree with CURED's contention that the Commission decision was void based on the denial of its motion to supplement.

¶ 51     CURED's argument related to the denial of its motion to dismiss is equally unavailing for the same reason. As shown above, the Staff memorializations were proper under SOEEA. No further memorialization was necessary under the APA and the exception under the Public Utilities Act applied. We therefore disagree that the Commission decision was void and find CURED's motion to dismiss was properly denied.

¶ 52     CURED's final argument contends that the Commission's finding that ATXI was capable of financing the proposed construction without significant adverse financial consequences was in error. It claims the Commission decision is void because the Commission relied on matters outside the record in contravention of sections 10-35(c) and 10-50(c) of the APA (5 ILCS 100/10-35(c), 10-50(c) (West 2024)). CURED contends that the Commission's reliance on Staff data requests directed to ATXI and ATXI's responses were matters outside the record that were part of the Commission finding that ATXI was capable of financing the proposed project. CURED requests *de novo* review of the issue claiming it is a question of law. Staff and ATXI argue that CURED misstates the record and that a manifest weight of the evidence standard of review applies. We agree with Staff and ATXI.

24

¶ 53　The underlying issue is whether ATXI showed that it was capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers. See 220 ILCS 5/8-406(b)(3) (West 2024). Our review of such inquiry is typically whether the Commission's decision was against the manifest weight of the evidence, which would require reversal only if an opposite conclusion was clearly evident. *Apple Canyon Lake Property Owners' Ass'n v. Illinois Commerce Comm'n*, 2013 IL App (3d) 100832, ¶ 57. In making this determination, we review the record to determine if the Commission's findings are supported by substantial evidence. *Illinois Power Co. v. Illinois Commerce Comm'n*, 382 Ill. App. 3d 195, 201 (2008). "Substantial evidence consists of evidence a reasoning mind would accept as sufficient to support the challenged finding; it is more than a scintilla of evidence but requires something less than a preponderance of the evidence." *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2013 IL App (4th) 121008, ¶ 18. We accept the Commission's findings as *prima facie* true, and the burden of proof on all issues raised on appeal is on the appellant. 220 ILCS 5/10-201(d) (West 2024).

¶ 54　Here, nothing in the record demonstrates that an opposite conclusion is clearly evident. Jontry provided testimony addressing both ATXI's numerous opportunities for borrowing funds and further revealed how the borrowed funds would be recouped. Staff engineer, Maurer, found Jontry's testimony on this issue sufficient to opine that ATXI's financial capability was not an issue in this matter. More importantly, no evidence to the contrary was submitted by CURED or any of the other intervenors. CURED's claim of insufficient evidence cannot be reconciled with the record when CURED was given a lengthy opportunity to cross-examine Jontry and the only financial questions involved a land acquisition transaction, not the financial capability of ATXI to

25

complete the project. As no "opposite conclusion" can be found without evidence to the contrary, we cannot hold that the Commission's finding was against the manifest weight of the evidence.

¶ 55    Nor do we find the Commission's inclusion of information related to data set requests and ATXI's responses in its order sufficient to void the decision or even sufficient to support CURED's due process issue. We will only set aside the decision if the Commission acted outside its authority, infringed on a constitutional right, or where its findings are against the manifest weight of the evidence. *Citizens Utilities Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 206 (1988).

¶ 56    We first note that Staff only provided the explanatory statements addressing the data set requests and responses because CURED claimed, in its initial brief after the record was closed, that Staff failed to analyze the financial strength of ATXI. We further note that at no time did CURED move to strike Staff's assertions, which consisted of approximately four lines of information, from the record. More importantly, Staff's statements did not address ATXI's financial capability; they addressed Staff's investigation into ATXI's financial capability and therefore, did nothing to undermine the Commission finding of financial capability, especially where none of the data sets were submitted into evidence and no additional information regarding ATXI's financial capability was gleaned from those statements. As such, we cannot find that Staff's statements, although improperly presented by Staff and erroneously included by the Commission, provided any basis for the Commission's ultimate finding related to ATXI's financial capability.

¶ 57    CURED's voidness claim related to the Commission's inclusion of Staff's explanatory statements regarding the requested data sets and ATXI's responses is equally stymied by the lack of financial information contained in Staff's statements. As noted above, the statements contain

26

no financial information that would sway the Commission in determining whether ATXI possessed the financial ability to proceed with the project. Section 10-50(c) of the APA requires the proceedings to be conducted in compliance with the Act. 5 ILCS 100/10-50(c) (West 2024). It is undisputed that Staff's statements were not presented at the hearing. However, CURED presents no argument as to why the Commission acknowledgement of Staff's investigation of ATXI's financial ability, which is contained within four sentences of a 77-page order, would require this court to find the decision was void. This is especially true when the only basis for Staff's statements in the first place was to respond to CURED's argument that Commission Staff failed to investigate the issue of ATXI's financial capability. The four sentences in the Commission decision are irrelevant as to the issue of whether ATXI produced sufficient evidence of its financial capability at the hearing. Therefore, even if this was properly classified as error, at most, the error was harmless since the Commission never saw the underlying data sets. See *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 157 (noting that harmless error occurs when, despite the presence of an error, it appears no harm was done, and reversible error occurs when the error appears to have affected the outcome of the trial). Accordingly, we decline to hold that those four sentences in the Commission decision rendered the decision void under section 10-50(c) of the APA.

¶ 58    CURED's due process argument is even less compelling than its voidness argument. Its argument consists of one conclusion of law and a three-sentence quotation from *Cook County Federal Savings & Loan Ass'n v. Griffin*, 73 Ill. App. 3d 210, 213-14 (1979). The lack of argument borders on the possibility of requiring this court to find the issue is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). However, since forfeiture is a limitation on the parties, not this court

(see *Triumph Community Bank v. IRED Elmhurst, LLC*, 2021 IL App (2d) 200108, ¶ 49), we briefly address the case cited by CURED.

¶ 59    In *Griffin*, a commissioner approved Wabash Building and Loan Association's application to relocate. *Griffin*, 73 Ill. App. 3d at 212-13. Cook County Federal Savings and Loan filed a motion to compel the commissioner to file supplemental documents reviewed as evidence in the commissioner's decision. *Id.* at 213. The motion to compel was denied. *Id.* The issue was "whether the Commissioner's refusal to supply the plaintiff, the trial court, and this court with all the evidence he considered in approving [the] applications deprived plaintiff of a fair hearing." *Id.* at 212. Ultimately, the appellate court found that it did and remanded the case back to the commission to reopen the record to include the missing evidence. *Id.* at 219.

¶ 60    *Griffin* is easily distinguishable. First, CURED never moved to compel Staff to submit the missing data sets. Second, unlike *Griffin*, CURED was already in possession of the information contained in the data and had been for nearly a year before the hearing. More importantly, the information contained within the data sets could not be the basis of the Commission's decision because the data set information was never submitted to the Commission. Due process requires a fair hearing. *Id.* at 216. In the case at bar, CURED was allowed to present evidence, in-person cross-examination of the witnesses, and was privy to the discovery requests and responses between the parties. Such allowances contradict any conclusion of a due process violation especially when the four sentences did not affect the Commission's ultimate decision in this case. Accordingly, we deny CURED's claim of a due process violation.

¶ 61                                    III. CONCLUSION

¶ 62    For the reasons stated herein, we hereby affirm the Commission's order denying CURED's motions and granting ATXI the certificate of public convenience and necessity. We also deny

28

CURED's requests for a finding that the Commission decision was void or that its due process rights were violated.

¶ 63    Affirmed.

---

*Citizens United for Responsible Energy Dev. NFP v. Ill. Commerce Comm'n, et al.*,
**2026 IL App (5th) 250022**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Illinois Commerce Commission, ICC Docket No. 23-0299 |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Terry I. Bruckert, John P. Long, of Bruckert, Behme & Long P.C., of O'Fallon, Edward D. McNamara Jr., Joseph H. O'Brien, of McNamara & Evans, of Springfield, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellees:** | Vernita E. Cockrell, of Joliet, Eric E. Dearmont, Jason Kumar, of Ameren Services Co., of St. Louis, MO, Albert D. Sturtevant, III, of Whitt Sturtevant LLP, of Chicago, for Ameren Illinois Co. and Ameren Transmission Co., appellees. Carrera Wilson, of Whitt Sturtevant LLP, of Chicago, for Ameren Transmission Co., appellee. Laurie A. Harmon, Garrett Thalgott, of Ill. Agricultural Assoc., of Bloomington, for Ill. Agricultural Assoc., appellee. Brian JD Dodds, Robert W. Funk, II, Thomas R. Stanton, of Chicago, for Illinois Commerce Comm'n, appellee. John L. Gilbert, of Sandberg, Phoenix & von Gontard P.C., of Edwardsville, for Tri-Township Water Dist., appellee. |

---